WILLIAM J. WALLACE v. HIGGINS LAND COMPANY.[1]

March 9, 1917.

Nos. 20,087—(243).

**Mine and minerals — action for services — verdict not supported by evidence.**

There was no evidence in this case reasonably tending to sustain a verdict for plaintiff.

Action in the district court for St. Louis county to recover $50,000 for services rendered at the request of defendant as an explorer of timber, mineral and other lands. The case was tried before Dancer, J., who at the close of the testimony denied defendant's motion for a directed verdict, and a jury which returned a verdict for $15,000. From an order granting defendant's motion for judgment notwithstanding the verdict, plaintiff appealed. Affirmed.

*Crassweller, Crassweller & Blu,* for appellant.

*Fryberger, Fulton & Spear,* and *Jaques & Hudson,* for respondent.

BUNN, J.

The trial court granted defendant's motion for judgment notwithstand-

1Reported in 161 N. W. 597.

ing the verdict in favor of plaintiff, and the case is presented to this court on plaintiff's appeal from this order.

The ultimate question for our determination is whether there was evidence on the trial reasonably tending to sustain a verdict for plaintiff. It has been a work of some magnitude to read the very voluminous record, but it is a more difficult task to give any synopsis that will, at the same time, be reasonably brief, and still fairly state the situation as it was presented by the evidence when the case went to the jury. We have been greatly aided by the full and able briefs of counsel.

The action was to recover the reasonable value, alleged to be $50,000, of services alleged to have been rendered by plaintiff to defendant at its request between May 1, 1908, and March 1, 1912, in the investigation and discovery of matters relating to a mineral lease covering lands owned by defendant, ascertaining that the terms of this lease were financially unfavorable to defendant, so advising the officers of defendant, and recommending steps to be taken to secure a remedy. The issues on the trial were as to what services plaintiff performed for defendant, and whether it was understood that defendant was to pay plaintiff therefor.

The following is an attempt at an outline of the case as it stood when the testimony was closed:

Plaintiff has resided in Duluth since 1893, and practically all his life has been a timber explorer, doing some work at times as an explorer of mineral lands. Defendant is a Minnesota corporation, owning large land interests in the northern part of the state. Its principal office was in Olean, New York, with a branch office in Duluth. In 1901 defendant owned an undivided one-half interest in 1,346 acres of land in township 58 north of range 16, St. Louis county. September 30, 1901, it leased its undivided half interest in these lands to William J. Olcott of Duluth. This lease provided for the payment of a royalty of 20 cents per gross ton for all ore mined, thus making defendant's interest in the royalties 10 cents per ton. The minimum output provided for in the lease was 100,000 tons per annum, making the minimum royalties payable to defendant the sum of $10,000 per annum. This is the so-called "Olcott Lease," and the services for which plaintiff claims compensation were all rendered in acquainting defendant's officers with the fact that this was an

unfavorable lease to the company, particularly as to the minimum to be mined each year, and in persuading them to take the steps which subsequently resulted in a new agreement, the value of which to defendant is agreed to be $1,000,000 more than the value of the original lease.

The lands covered by the lease, together with other lands in northern Minnesota, largely on the iron ranges and containing large and rich deposits of iron ore, were purchased by O. T. Higgins, of New York, in the early "eighties." He died in 1900, leaving as heirs a son Frank W. Higgins, afterwards Governor of New York, and a daughter, Mrs. Clara A. H. Smith, wife of Frank Sullivan Smith, a New York City lawyer. The lands of O. T. Higgins after his death were transferred to different corporations, among them being Higgins Land Company, the defendant in this action. Frank W. Higgins was the president of defendant until his death in 1907. Frank Sullivan Smith, husband of Clara A. H. Smith, sister of Governor Higgins, was vice president, Allan B. Williams was secretary and O. T. Higgins, Jr., a son of Governor Higgins, was treasurer. All of these officers lived in the state of New York. Governor Higgins, his son, and Williams lived in Olean, where the home office of the land company was. Frank Sullivan Smith was a New York City lawyer. Until his election as Governor, Frank W. Higgins, at all times the strong man of the company, visited Duluth many times each year and kept in close touch with the properties of the company. After his election to the governorship, his visits to Duluth were less frequent. After his death, his son, O. T. Higgins, Jr., became president of the defendant company, and held this office until he died in 1912, when Clara A. H. Smith became president. After the death of the Governor and during the presidency of his son, who was ill and paid no attention to the affairs of the company, Frank Sullivan Smith took an active part in the management of the company, but he does not appear to have held any office in the company after the death of Governor Higgins, when Frank L. Bartlett, one of the executors, succeeded him as vice president. The stock of the company was largely owned by the estate of O. T. Higgins, Clara A. H. Smith and Frank W. Higgins. Giles Gilbert of Duluth owned 11 shares and until his death May 4, 1908, represented the interests of the company in Duluth.

A few words will explain the nature of plaintiff's relations with the

Higgins interests before the performance of the services for which he seeks pay in this case. Plaintiff has lived in Duluth since 1893. Practically all his life he had been a timber land explorer, and had done some work in mining exploration for interests other than the Higgins interests. He was familiar with the range and with the mining explorations there. His first connection with the Higgins people was in 1898, when he was employed by Giles Gilbert to do some "woods work." He continued to do this sort of work, exploring timber lands, estimating and selling timber and timber lands for the Higgins people for some years. He made the acquaintance of Governor Higgins in 1902, and continued in the service. He was paid in full for all services prior to those he claims compensation for in the present case. It does not appear that he was ever employed to explore mineral lands or in connection with the company's mining interests, though he may have given advice or made suggestions in regard thereto. He received his compensation for these services either in money from Mr. Gilbert or the home office, or in commissions in the case of sales. There can be no suggestion that plaintiff was ever recognized by defendant as employed by it generally to perform any services he might think necessary. This brings us down to the services for which compensation is sought in this action.

In January, 1908, plaintiff went to New York and met Frank Sullivan Smith and Mrs. Smith. He went again in May, 1908, and on this occasion claims to have had a talk with Frank Sullivan Smith in his office, and to have told him of the great value of the lands owned by defendant, and covered by the Olcott lease. Plaintiff claims that he went east expressly to see Mr. Smith on the matter of the value of the company's lands on the range, and the improvidence of the terms of the Olcott lease. There is evidence that plaintiff's trip was for another purpose, and that his visit to Mr. Smith was merely incidental, but we must take the view of this circumstance that is most favorable to plaintiff. He makes no claim, however, that he was requested by anyone connected with the Higgins' interests to take the trip or advise them as to the value of their ore lands. He was purely a volunteer. The substance of the alleged conversation with Mr. Smith in his New York office in May, 1908, may be stated thus: Plaintiff, who had become familiar with recent mining operations in the vicinity of the leased lands, claims to have discovered

that the ore formation, contrary to what was shown on old maps, extended south so as to include the leased lands, told this in detail to Mr. Smith, explaining the developments of the past few years in the vicinity of the lands, and exhibiting a geological map which showed the ore body extending to the south. Plaintiff claims that this was all new to Mr. Smith and the Higgins people; that they had not kept in touch with the situation, and that he woke them up. He testifies that Mr. Smith told him that he greatly appreciated his coming down there, and that he would "see him well paid." Mr. Smith denies making any such statement. This is but the briefest outline of the conversation, but it will suffice for the present. It is this trip, and the information given in this conversation, that largely form the basis of plaintiff's claim to having performed services for defendant for which payment was promised.

The next services which plaintiff performed were in connection with a trip to the range of Mr. Smith, Mrs. Smith, Mr. Williams, secretary of defendant, and Mr. Bartlett and Mr. Franchot, the executors of the Frank W. Higgins' estate. Plaintiff claims Mr. Smith had stated in March that he would arrange this trip, would notify plaintiff of the time and would see him when the trip was made. Smith wrote plaintiff in June that he would advise him when the trip was to be made, and Mr. Williams wrote plaintiff, saying that the executors were coming to Duluth to attend a meeting of the stockholders of the company and to get acquainted with the properties of the company and of the estate, asking plaintiff if he would be at liberty to go, and make the arrangements. Plaintiff replied that he would be able to make the trip, and that he would go to Hibbing and make the arrangements. He did this, and so advised Williams, stating that he thought it was advisable to go to Mr. Cole or Mr. McLain of the Steel Corporation and get letters to the captains of the mines, so that the party would be in position to get access to the various maps from the mining engineers. Mr. Williams wired plaintiff to secure these letters, and plaintiff saw Mr. Cole, who agreed to furnish the letters, and offered the party his private car and the services of the chief engineer of the Oliver Company as "chaperon." The party arrived in Duluth about the middle of June, 1908. They accepted Mr. Cole's offer and took the trip to the range in his private car and with Mr. Sebenius, the chief engineer, as a member of the party. Plaintiff accompanied the party, which made a general trip of the range, visiting all

points of interest. Plaintiff testifies to certain conversations on this trip with Mr. Smith and with Mr. Bartlett, one of the executors and also the vice president of defendant company. In these conversations plaintiff called attention to the fact that mining or exploration work was being done on the leased lands, and again pointed out that the ore formation extended so as to include these lands. We need not follow the parties further on this trip. It is apparent enough that plaintiff might well have asked a *per diem* compensation for his services as the arranger of details and guide on this trip, but it appears that he did not. After the return of the party, plaintiff was asked for his bill for services and disbursements on the trip. He sent a statement of his disbursements, but charged nothing for his services, expressing the pleasure he had derived from the trip.

Some time after this plaintiff, who had made a copy of the Olcott lease, claims that he studied its provisions, and, in the spring of 1909, consulted an attorney of Duluth. He discovered that the timber on the leased lands still belonged to defendant, and in the summer of 1909 so advised Mr. Williams, the secretary of the company, whom plaintiff accompanied on another trip to the range. Plaintiff testified that he also told Mr. Williams that he was investigating the proposition of the lease and the terms thereof, and that Mr. Williams stated that "he hoped something could be done." At this time plaintiff and Williams also discussed a letter written to plaintiff May 1, 1909, signed by Clara A. H. Smith and Higgins Land Company by F. L. Bartlett, vice president. In this letter, after thanking plaintiff for a letter of his containing information as to certain parties who desired leases, the writers used this language: "We are in communication directly with some of these parties about leases of our lands and not wisihng you nor them to have any misapprehension in the matter we desire to notify you that neither Mr. Allan B. Williams, our competent secretary, nor you, who have from time to time given us friendly advice, are authorized in any manner to make any leases or other business deals for us as agent or otherwise except as authorized by us over our own signatures; nor is any other person so authorized at present. Any suggestions you make to us we shall consider in the line merely of desiring to further your own interests as well as ours, but we shall not expect to compensate you in any way for this." Plaintiff testified

on cross-examination that he understood from this letter that Mrs. Smith and Higgins Land Company wanted him to be under no misapprehension; that he was not authorized to go ahead; that he was notified to keep his hands off their business. He immediately replied, in a letter stating that: "Any and all information I have given the Higgins' interests on iron matters in the past has always been voluntary, and I never expected or looked for any compensation for same." Referring to a prosposition for an option for a lease that he had succeeded in getting a Mr. Sinclair to make, plaintiff said that he was "not acting as agent for you, the Higgins Co. or Mr. Sinclair," but was "the middleman in the deal, the same as I have been in a great many others with the Higgins interests." He wrote again May 4, inclosing a release of all claims or commissions in case the options were taken. Plaintiff testified that Mr. Williams told him that Mr. Bartlett had signed the letter of May 1 just to please Mrs. Smith, and that he should pay no attention to Mrs. Smith, but keep right on just as he had always done.

The next act in this drama was staged in the fall of 1909. The first episode is a letter from plaintiff to Frank Sullivan Smith, dated September 30, 1909. This letter has a strong bearing on the case, and we give it in full:

"Dear Mr. Smith:

"I have been considering the taking up of an important matter with the Higgins' interests for some time. When Mr. Allan B. Williams was up here last July, I told him that I was going to investigate and see what could be done, and, as you are the Higgins interests' legal adviser and officer and director of their various companies, I have concluded to take the matter up direct with you, as I am of the opinion that if my plans are successfuly carried through, the Higgins' interest will be benefited financially.

"A local party is interested here with me and would expect to share in the profits. As I am placed in the position of a broker in this matter, I would want to be assured that I would be benefited as well as the Higgins' interests if my plans are successfully carried through."

It is important to note that this letter, far from containing any reference to the matter having been before taken up with Mr. Smith, or the Higgins interests, and far from suggesting that plaintiff had already per-

formed any services in the matter of the Olcott lease, or that there had been any promise to recompense him, on the contrary broaches the subject as a new one, and asks to be assured that he, as a broker, will be financially benefited if his plans are successfully carried through. This seems contradictory of and utterly inconsistent with plaintiff's claim of a promise of compensation made by Smith in March of 1908. Mr. Smith replied to this letter on October 2, saying that he would like to be advised of the scope of the proposition, as he was entirely in the dark on the subject. Plaintiff answered October 8, in a letter saying: "My proposition is a broad one and means much to the Higgins' interest. I have had this proposition in mind for the last two years and have thoroughly looked into the matter, and my plan is to force the Steel Company to increase the minimum output and royalty on certain Higgins' leases. This may seem strange to you, but I am satisfied from the information and knowledge I have that it can be done, and, if successful, I think I should share in the profits to the extent of $3,600.00 per year salary, for which I would further expect to advance the Higgins' interests." Plaintiff complained because somebody had been "knocking him" with the Higgins' interests by advising the employment of a mining engineer the year around, and stated that "the last few years the Higgins' interests has placed me in the position of a broker; if there was any business done, I have always generally started the same." Mr. Smith replied to this letter on October 20, saying: "I do not exactly understand what you mean by your letter. If you refer to the Olcott lease, I have had in my office for over a year a brief on the subject of an equity action to reform the lease, and took the matter up with Mr. Cole before his retirement from the Oliver Iron Mining Co." "I regret that I am so slow in understanding your proposition and shall be very glad if you will make it more definite." No reply to this letter appears in evidence. It would seem that Smith understood perfectly well that plaintiff in his letters was speaking of the Olcott lease, and was proposing an attempt to reform or modify its provision by an action. The evidence shows that about October 15, pursuant to arrangements made by telegraph, Mr. Smith met Frank A. Barber of Duluth at Angelica, New York, and again in Buffalo. He engaged Barber to consult lawyers in Duluth in regard to an action to reform the Olcott lease. Barber knew nothing of this lease at the time, but he was

supplied with a copy of it and also with a brief which had been prepared. This was all before the letter of October 20, from Smith to plaintiff. Barber peddled the case around Duluth until he found lawyers willing to begin an action. The action was settled, and the terms of the lease modified as before stated.

We will close this effort to condense into some reasonable compass the material evidence most favorable to plaintiff with a reference to his claim of a promise on the part of Mrs. Smith, in 1912. Plaintiff testified that he met Mrs. Smith in Duluth and that she told him he was "a regular encyclopedia of useful information, and that she would see me well paid." We dismiss this claim of a promise, with the statement that the evidence has no tendency to prove either an express or implied contract by defendant company to pay plaintiff for his services in connection with the Olcott lease.

Plaintiff's claim, in its last analysis, is that the officers of the defendant were wholly ignorant of the value of the leased lands for mining purposes, that he supplied information that made them acquainted with this value and induced them to take the action which resulted in a modification of the lease. We have thought it unnecessary to discuss the evidence relative to the knowledge or ignorance on the part of defendant's officers in May, 1908, as to late developments on the range that indicated that the leased lands were of great value, or the evidence as to when or in whose mind the first idea of an attempt to reform the lease originated. We will assume that a jury would be justified in finding that plaintiff "built a fire under" defendant's sleeping officers. The trouble with his effort to obtain compensation for this service is that it was a purely voluntary one. The record is barren of evidence as to any request for plaintiff to perform this service. It seems to us that his claim of a promise by Smith in May, 1908, that he should be well paid for his services is conclusively refuted by the letter of May, 1909, to Mrs. Smith, and the letters of September 30 and October 8, 1909, above quoted. If he had any agreement for compensation or any expectation of receiving it, why did he write in reply to the letter of Mrs. Smith speaking of his friendly advice, and expressly stating that they should not expect to compensate him, that "any and all information I have given the Higgins' interests on iron matters in the past has always been voluntary, and I never expected

or looked for any compensation for same?" We see no reasonable answer to this query. Again, if he had discussed the Olcott lease with Smith at such length in the spring of 1908, and received his promise that he should be well paid, why did he write him September 30, 1909, that he had been "considering the taking up of an important matter with the Higgins' interests for some time," that he had "concluded to take the matter up direct with you," that, as a broker in the matter, he would want to be assured that he would be benefited if his plans went through? Why did he say in his letter of October 8, after telling what his plans were, that "this may seem strange to you?" Why did he suggest that if successful he thought he should "share in the profits to the extent of $3,600 per year salary, for which I would further expect to advance the Higgins' interests?" We are unable to escape the conclusion that the evidence is conclusive against plaintiff's right to recover for any service performed before the letters of September and October, 1909, were written.

As to his right to compensation for the suggestions contained in these letters, particularly the disclosure of his rather indefinite plan to "force the Steel Company to increase the minimum output and royalty on certain Higgins leases," there was plainly no express or implied agreement to pay for this suggestion, even conceding that it was a new one to defendant. Taking the letters by themselves, without reference to prior talks, we have the simple case of a request by a broker that he be employed to perform certain services for compensation. His request is not granted, but defendant employs another to do the work. It can hardly be doubted that the broker whose request is thus declined has no right to compensation.

The facts are such as naturally to create sympathy for plaintiff in the eyes of a jury. As stated by the learned trial court: "It is possible that plaintiff furnished the defendant company with some information bearing on the Olcott lease which had not been called particularly to [its] attention, although in the company's files. It is quite possible that the action taken by the company which finally resulted in the new agreement respecting the Olcott leased lands was due in part at least to the suggestion and advice of plaintiff." But, as the trial court held, we think "there is no evidence reasonably tending to support a finding that plaintiff ever furnished any such information or gave any such advice or

encouraged such action under circumstances such as to render the company liable therefor." In a word, the evidence is practically conclusive that such services as plaintiff rendered as defendant has not paid him for were rendered without any agreement or expectation that plaintiff was to be compensated therefor.

Order affirmed.